UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

ASHLEY BELCHER,
Personal Representative of
The ESTATE of ETHAN BELCHER, deceased,
and ASHLEY BELCHER
as Next Friend of M.B., a minor

       Plaintiffs,

-vs-

MIRANDA OSTROWSKI,
in her individual capacity, and
TEDRA WHITE, in her individual capacity,

       Defendants.

Case No:
Hon.

---

ZACHARY T. RUNYAN (P83671)
**RUNYAN LAW GROUP**
Attorneys for Plaintiff
31211 Jefferson Avenue
St. Clair Shores, MI 48082
(248) 341-0794
zrunyan@runyanlawgroup.com

---

There is no other civil action between these parties arising out of the same transaction or occurrence as alleged in this Complaint pending in this Court, nor has any such action been previously filed and dismissed or transferred after having been assigned to a judge, nor do I know of any other civil action, not between these parties, arising out of the same transaction or occurrence as alleged in this Complaint that is either pending or was previously filed and dismissed, transferred or otherwise disposed of after having been assigned to a Judge in this Court.

_____

## **PLAINTIFFS' COMPLAINT**

NOW COMES Plaintiffs, by and through their attorneys, **Runyan Law Group**, and for their Complaint against the Defendant named herein, states as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction of the action under the provisions of Title 28 of the United States Code, Sections 1331, 1343, and 42 USC §1983.

2. This a civil action brought pursuant to the Civil Rights Act, 42 U.S.C. §1981, *et seq.*, seeking monetary and punitive damages against Defendants under 42 U.S.C. §1983, and costs and attorney fees under 42 U.S.C. §1988, for violations of Plaintiff's rights under the Fourth and/or Fourteenth Amendments of the United States Constitution.

3. Plaintiffs bring the suit against each and every Defendant in her individual capacities.

4. Each and every act of Defendants, as set forth herein, were done by those Defendants under the color and pretense of the statutes, ordinances, regulations, laws and customs, and by virtue of, and under the authority of the color of law and such actions were performed in the course and scope of employment of each individual Defendant.

5. That the amount in controversy exceeds Seventy-Five Thousand ($75,000.00) Dollars, exclusive of costs, interest, and attorney fees.

## PARTIES

6. Plaintiff Ashley Belcher, as Personal Representative of the Estate of Ethan Belcher, Deceased, and As Next Friend of M.B., a minor, is a resident of the Township of Oscoda, County of Iosco, State of Michigan.

7. Defendant, Miranda Ostrowski, was at all times relevant hereto, acting under color of law and in the course and scope of her employment with Michigan Department of Health of Human Services in the Child Protective Services Division. Upon information and belief, Defendant Ostrowski is a resident of this District. Defendant Ostrowski is named in the action in her individual capacity.

8. Defendant Tedra White, was at all times relevant hereto, acting under color of law and in the course and scope of her employment with Michigan Department of Health of Human Services in the Child Protective Services Division. Upon information and belief, Defendant White is a resident of this District. Defendant White is named in the action in her individual capacity

# FACTUAL ALLEGATIONS

**I. DEFENDANTS WERE FIRST MADE AWARE IN 2021 THAT PLAINTIFFS WERE BEING ABUSED BY THEIR MOTHER AND THEIR MOTHER'S LIVE-IN BOYFRIEND**

9. Valerie Hampton is the biological mother of E.B[1]. and M.B[2].

10. From approximately 2021 through the time of their incarceration, Valerie Hampton lived with her boyfriend, Shane Shelton.

11. From 2021 through January 2023, E.B., M.B., and three other minors primarily lived with Hampton and Shelton.

12. Shortly after E.B. and M.B. began living with Hampton and Shelton, it became apparent to other family members that Plaintiffs were being abused by Hampton and Shelton.

13. In February of 2021, Plaintiffs' Aunt observed that Plaintiffs had significant bruising over their buttocks and legs.

14. Additionally, E.B. was observed with severe bruising on his head and eye.

15. Due to the injuries, Plaintiffs' Aunt took Plaintiffs to Beaumont Hospital in Trenton, MI.

---

[1] E.B. refers to the decedent, Ethan Belcher.
[2] E.B. and M.B. will be referred to collectively as "Plaintiffs".

4

16. At the hospital, doctors determined that Plaintiffs injuries were the result of physical abuse. As a result, Plaintiffs were transferred to Detroit Children's Hospital for specialized evaluations.

17. During the evaluation at Children's Hospital, M.B. disclosed that Shelton physically abused Plaintiffs.

18. Due to the disclosure and the nature of Plaintiffs' injuries, the specialized evaluations determined that Plaintiffs injuries were the result of physical abuse, and a complaint was made to Child Protective Services ("CPS"), centralized intake.

19. On February 26, 2021, CPS opened an investigation related to the report.

20. The CPS case was assigned to Defendants White and Ostrowski.

21. Given the injuries, Defendants removed Plaintiffs from Shelton and Hamilton's custody.

22. Defendants Ostrowski and White interviewed Plaintiffs while they were still admitted to Children's Hospital.

23. Defendants Ostrowski and White noted Plaintiff's injuries and identified that the injuries were consistent with physical abuse.

24. Shockingly, despite observing the significant nature of the injuries, Defendants failed to take any photographs to document the injuries caused by abuse.

25. On or about March 18, 2021, Lincoln Park and Defendants conducted "Kids Talk" interviews with Plaintiffs.

26. During M.B.'s interview, he disclosed to investigators that Shelton hit and punched Plaintiffs.

27. On that same day, Lincoln Park PD interviewed Shelton.

28. During the interview, Shelton disclosed, among other things, that he frequently "rough housed" with Plaintiffs despite them only being 3 and 4 years old respectively.

29. Shelton also agreed to submit to a polygraph test on April 8, 2021.

30. However, Shelton never appeared for the polygraph test.

31. Through their investigation, Defendants concluded that Shelton abused Plaintiffs and that he was the source of the injuries identified in February 2021.

32. The CPS investigation was dispositioned as a Category II and indicated that criminal charges would be pursued against Shelton.

33. MCL 722.628d(d) states that a case is categorized as a Category II when there are "child protective services required. The department determines that there is evidence of child abuse or child neglect, and the structured decision-making tool indicates a high or intensive risk of future harm to the child. The department must open a protective services case and provide the services necessary under this act."

34. Despite Defendants acknowledging that Shelton abused Plaintiffs and that there was high or intensive risk of future harm to Plaintiffs, Defendants placed Plaintiffs back into the care of Shelton and Hamilton on April 13, 2021.

35. Additionally, CPS's investigation was not turned over to the prosecutor's office until October of 2021, nearly eight months after the abuse was first reported, and 6 months after Plaintiffs were returned to Shelton's custody.

## II. **DEFENDANTS IMPROPERLY CLOSED THEIR PROTECTIVE SERVICES CASE DESPITE SHELTON'S NON-COOPERATION AND FAILED TO SUBMIT A PETITION WITH THE COURT TO REMOVE PLAINTIFFS FROM THE HOME AS REQUIRED BY MICHIGAN LAW**

36. At the time Plaintiffs were returned to the care of Hamilton and Shelton, Defendants informed Hamilton and Shelton that they would be required to participate in 'services' provided by Defendants.

37. Among the 'services' Shelton and Hamilton were supposed to participate in were periodic home-visit meetings with Defendants.

38. Among other things, the purpose of the home visits was to observe Plaintiffs and ensure they were free from injuries and did not exhibit any other signs of physical abuse.

39. Defendants were supposed to conduct the first home visit on April 30, 2021.

40. However, due to Hamilton and Shelton claiming they had COVID-19, Defendants agreed to conduct the visit remotely which made it impossible to examine Plaintiffs for signs of abuse.

41. On or about May 13, 2021, Defendants conducted the second home visit.

42. On this occasion, Defendants remained outside the home, and only communicated with Plaintiffs and Hamilton through a closed screen door and window due to "concerns of Covid-19".

43. Conducting the visit in this manner made it impossible to examine Plaintiffs for signs of abuse.

44. On June 8, 2021, Defendants conducted the third home visit.

45. On this occasion, Defendants again only communicated with Hampton and Plaintiffs through a closed screen door and window because Hampton claimed, again, that she had COVID-19.

46. Following the third home visit Defendants completed a safety assessment for Plaintiffs.

47. Defendants improperly scored Plaintiffs environment with Hamilton and Shelton as "safe".

48. Within the safety assessment, Defendants failed to document that Shelton was living in the home and failed to identify that Shelton was considered a person responsible for Plaintiffs by law.

49. Additionally, the risk assessment identified that Shelton needed to continue to work on his parenting skills and to maintain adequate discipline techniques.

50. However, Shelton never participated in the services provided by Defendants.

51. Despite this, Defendants closed their ongoing services case on June 15, 2021, without Shelton's participation.

52. The Michigan Department of Health and Human Services subsequently admitted that Defendants failed to ensure that Shelton, who was a substantiated perpetrator, participated in services to address the identified needs.

53. MCL 722.628d(e)(ii) provides that when "The department previously classified the case as Category II and the child's family does not voluntarily participate in services" the case must be reclassified as a Category I.

54. In addition to classifying the case as a Category I, CPS and the CPS employees assigned to the case must "submit a petition for authorization by the court under section 2(b) of chapter XIIA of the probate code of 1939, 1939 PA 288, MCL 712A.2."

55. Given Shelton's refusal to voluntarily participate in services, Defendants were required to reclassify the case as a Category I and submit a petition for authorization by the court under section 2(b) of chapter XIIA of the probate code of 1939, 1939 PA 288, MCL 712A.2.

56. Defendants failed to take these required steps, failed to ensure that Shelton participated in the required services, and instead closed the case and left Plaintiffs within the custody of Shelton and Hamilton.

57. Michigan's Child Advocate case statistics indicate that in 75% of category II cases that are closed without the abusers participating in services, the result is a child's death.

### III.  ON JANUARY 22, 2023, E.B. DIED DUE TO HEINOUS CHILD ABUSE AND TORTURE FROM HAMILTON AND SHELTON

58. On January 22, 2023, Detroit Fire Department was dispatched to Hamilton and Shelton's residence due to a report that E.B. was not breathing.

59. Upon arrival, Detroit Fire Department found E.B. unresponsive and promptly transported E.B. to the hospital.

60. Once at the hospital, E.B. was observed to have injuries including, but not limited to:

    a. Abrasions and contusions to the head, torso, and extremities including, but not limited to, left hip, scrotum, perianal skin, anus, bilateral arms, and bilateral legs.

    b. Skull fracture

    c. Fractured vertebra at C7

    d. Fractured right posterior rib

    e. Left neck hematoma

    f. Puncture wounds to the buttocks and extremities

    g. Ligature marks on bilateral wrist and ankles

    h. Left hip dislocation

    i. Swollen left knee

    j. Necrotic left toe

    k. Gaping wound to the right 1st toe web

    l. Pneumonia, bilateral lung

61. Treating physicians also noted that E.B. displayed signs of sexual assault.

62. Despite life saving measures, E.B. was pronounced dead at 13:28 on January 22, 2023.

63. A post-mortem examination determined that E.B.'s cause of death was "multiple blunt and sharp force injuries with complications."

64. E.B. was five years old at the time of his death.

65. On January 22, 2023, Police identified that M.B. was also exhibiting injuries consistent with child abuse.

66. Among other injuries, M.B. was observed to have deformity on his right shoulder and sternum, bruising above the penile base, several locations of necrosis and distended abdomen.

67. Upon further investigation, Police recovered several disturbing messages between Hamilton and Shelton that detailed their abuse.

68. The recovered messages included, but were not limited to:

   a. Hamilton stated "I don't have what it takes to not kill mfs"

   b. Hamilton stated "I'll slam them so hard their heads with (sic) pop off. Legit pop right the fuck off…" Shelton responded to this message by saying "that's what happens when humans wanna act like wild animals."

   c. Hamilton stated "the bay has been screaming," "Seriously like non stop I beat him I yelled at him I did cold water, nothing works he's like a fucking military soldier." Shelton replied "Bet you go beat the dogshit out of him actually." Hamilton replied "I tried!" Shelton replied "your hand don't do shit" "I beat his ass this morning nothing happened."

69. Upon being interviewed by the police, Hamilton admitted that Shelton "excessively beat" Plaintiffs, which included beating Plaintiffs with his hands and other objects, such as a cord.

70. On or about September 25, 2024, Hamilton and Shelton were found Guilty by Jury for, among other things, Felony Murder, Torture, and two Counts of Child Abuse in the first degree related to their abuse of Plaintiffs.

# COUNT I
# DEPRIVATION OF CIVIL RIGHTS
# IN VIOLATION OF 42 U.S.C. § 1983 AGAINST DEFENDANTS VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENT- DENIAL OF PROCEDURAL AND SUBSTANTIVE DUE PROCESS

71. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

72. The conduct of the aforementioned Defendants deprived Plaintiffs of their clearly established rights, privileges, and immunities guaranteed to them under the United States Constitution, specifically the denial of substantive and procedural due process.

73. The Sixth Circuit has held that if a petition is mandated based on a substantive predicate, the failure to file a petition when the predicate is met constitutes a denial of procedural due process. *See Jasinski v. Tyler*, 729 F.3d 531 (6th Cir. 2013).

74. As identified above, Defendants were required to file a petition for authorization by the court under section 2(b) of chapter XIIA of the probate code of 1939, 1939 PA 288, MCL 712A.2.

75. Defendants failure to file such a petition constituted a violation of Plaintiffs' Right to Procedural Due Process.

76. As a direct and proximate cause and consequence of the unconstitutional acts described above, Plaintiffs were subjected to years of heinous

child abuse and torture, which resulted in the death of E.B., and caused substantial damage to M.B. who suffered and continues to suffer injuries, damages and losses as set forth herein.

## COUNT II:
## VIOLATION OF 42 U.S.C. §1983 – STATE CREATED DANGER

77. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

78. Plaintiffs are citizens of the United States entitled to all rights, privileges and immunities accorded to all citizens of the State of Michigan and the United States, including the clearly established right to not be deprived of life without due process of law under the Fourteenth Amendment to the United States Constitution, as enforced pursuant to 42 U.S.C. §1983.

79. Any reasonable person would be aware of this clearly established right.

80. Defendants knowledge of this clearly established right, and acting in deliberate indifference, violated Plaintiffs' right not to be deprived of life without due process, as secured by the Fourteenth Amendment's Due Process Clause, by taking affirmative acts under color of state law to disrupt the status quo and create a danger of death that did not exist in the status quo prior to those affirmative state actions, and by taking affirmative acts which caused the death of E.B. and both Plaintiffs to be subjected to significant torture and child abuse, which would not have happened but-for those affirmative state actions

81. At all relevant times, Defendants were acting under the color of state law as employees of MDHHS and its CPS Division, working with families, police, the courts and other agencies to prevent, identify, and treat child abuse and neglect.

82. Defendants' affirmative actions, as described above, created or increased the risk of harm to Plaintiffs.

83. The danger created by Defendants was specific to Plaintiffs, as distinguished from a risk that affects the public at large.

84. Defendants knew or should have known that their actions specifically endangered Plaintiffs.

85. Defendants acted with deliberate indifference toward Plaintiffs, as demonstrated by their failure to act in the face of a known and obvious risk of serious harm.

86. Defendants' conduct was so egregious and outrageous that it shocks the conscience.

87. As a direct and proximate result of the aforementioned conduct, Plaintiffs suffered severe emotional distress, physical torture and ultimately death, due to Defendants' deliberate indifference and failure to protect Plaintiffs from abuse. Additionally, the family of E.B. has endured profound grief, emotional trauma and loss due to Defendants' actions and omissions.

## COUNT III: WRONGFUL DEATH

88. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

89. At all relevant times, Defendants were employees of Michigan Child Protective Services, acting under color of state law and within the scope of their employment.

90. Under Michigan's Wrongful Death Act, MCL 600.2922, a cause of action may be maintained when the death of a person is caused by the wrongful act, neglect, or fault of another.

91. Plaintiff E.B. was a minor child under the protection and supervision of Michigan Child Protective Services.

92. Defendants owed a statutory duty of care to Decedent under Michigan law, including but not limited to MCL 722.621 et seq. (Child Protection Law), to protect Plaintiff's from abuse and neglect.

93. Defendants breached their duties to Plaintiffs by:

   a. Failing to properly investigate reports of abuse and neglect;

   b. Ignoring clear evidence of ongoing abuse and/or neglect;

   c. Failing to remove Decedent from a dangerous living situation despite having knowledge of imminent risk of harm;

   d. Failing to follow mandatory state protocols for child welfare investigations;

    e. Failing to communicate critical information between agencies and personnel;

    f. Returning Decedent to an unsafe environment without proper assessment.

    g. Failing to file a petition for authorization by the court under section 2(b) of chapter XIIA of the probate code of 1939, 1939 PA 288, MCL 712A.2

    h. Closing its case without ensuring Shelton's participation in the required services.

94. Defendants' conduct demonstrated a deliberate indifference to Decedent's constitutional rights and safety, as they had actual knowledge of facts from which they could infer a substantial risk of serious harm, actually drew that inference, and then disregarded that risk.

95. As a direct and proximate result of Defendants' gross negligence and deliberate indifference, Decedent suffered severe physical and emotional injuries, ultimately resulting in Decedent's death.

96. As a further direct and proximate result of Defendants' gross negligence and deliberate indifference, Decedent's statutory interested parties have suffered damages including, but not limited to:

    a. Reasonable medical, hospital, funeral, and burial expenses;

    b. Reasonable compensation for the pain and suffering of the deceased while conscious between the time of injury and death;

    c. Loss of financial support;

    d. Loss of society and companionship; and

      e. Other damages permitted under MCL 600.2922

97. The conduct of Defendants was willful, wanton, and in reckless disregard for the rights and safety of Decedent, entitling Plaintiff to exemplary damages.

## **RELIEF AND DAMAGES REQUESTED**

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment in his favor and against Defendants, jointly and severally, and award the following damages:

    a. Compensatory damages against Defendants.

    b. Punitive damages against Defendants;

    c. Any and all damages allowable under Michigan's Wrongful Death Act

    d. Costs incurred and attorney's fees pursuant to 42 U.S.C § 1988;

    e. Prejudgment interest; and

    f. Any other relief this Court deems equitable and just.

Respectfully submitted,

/s/ *Zachary T. Runyan*
Zachary T. Runyan (P83671)
**Runyan Law Group**
31211 Jefferson Ave.
St. Clair Shores, MI 48082
(248)-341-0794

Dated: January 14, 2026   Zrunyan@runyanlawgroup.com

## JURY DEMAND

Plaintiff, by and through counsel, hereby requests a trial by jury in the above-captioned matter.

Respectfully submitted,

/s/ *Zachary T. Runyan*
Zachary T. Runyan (P83671)
**Runyan Law Group**
31211 Jefferson Ave.
St. Clair Shores, MI 48082
(248)-341-0794
Zrunyan@runyanlawgroup.com

Dated: January 14, 2026